Robert S. STONE Jr.

~~File~~ Case # 8-24-72642

# How Reading Governor Cuomo's Executive Order 202.5 Drove Me Into Bankruptcy



Pdf File w/ Links To be uploaded Today 10/22/2024 When I get home from court

From *A Civil Action* (1998), final scene

**Bankruptcy Judge:** *What you're asking your creditors to believe is...Well, it's hard to believe.*

**Jan Schlichtmann:** *I know.*

**Bankruptcy Judge:** *After 17 years of practicing law, all you have to show for it is... 14 dollars in a checking account and a portable radio?*

**Jan Schlichtmann:** *That's correct.*

**Bankruptcy Judge:** *Where did it all go?*

**Jan Schlichtmann:** *The money?*

**Bankruptcy Judge:** *The money, the property, the personal belongings. The things one acquires in one's life, Mr. Schlichtmann. The things by which one measures one's life.*

*What happened?*

RECEIVED
2024 OCT 22 A 11: 54
CLERK
U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF
NEW YORK

1

## What Compelled Me to Read Governor Cuomo's COVID Executive Orders

Between 1996-1997, I spent my third year at St. John's Law School working in the Elder Law Clinic. After graduating St. John's in 1997, I spent the next five years working for a sole practitioner in Locust Valley doing Elder Law and Real Estate.

In the Spring of 2002, I left Locust Valley and flew solo doing primarily motion and appellate work until early 2006, when my father was diagnosed with vascular dementia. Since my mother had a stroke in the early 1990's, she was partially paralyzed on her left side and therefore physically incapable of taking care of my father alone. So, feeling I'd sooner wrap my lips around a revolver than turn my back on my mother, I put off my life and career to help her care for him at home.

As my father descended into madness, the never-ending scenes of changing his diapers while he kicked and screamed like a child for his *"mommy"* drove me to drown out self-awareness with television and food. No future, no past; just a perpetually urgent need to erase myself from the dementia-ridden present. The weight gain (+165 lbs.), diabetes, and congestive heart failure from sitting vigil at his bedside for years nearly killed me.

After my father passed away in 2010, I took care of my mother until she passed away on December 14, 2016. Shortly after her funeral, I found this in one of her Diaries:

> **9/23/08 2:22 am:**
>
> Ever since Bob retired in 2006, Bobby has insisted on cutting down on his law practice and staying here with Bob & I—just in case I need him! And I need him—God do I!! If it weren't for Bobby with all his legal advice, companionship, and help, Bob and I probably would be out on the streets God knows where!
>
> I know I've told him over and over what a wonderful son he is and that I'm so grateful for him—but I can't help feeling I'm keeping him from going out and finding a family of his own.

Having buried both my parents, the ten-year gap in my employment history made piecing together what was left of my life a daunting task. I spent the next few years doing part-time legal work, getting back in shape, and preparing for a career teaching law to college students.

So, on April 20, 2020, when I learned that Governor Cuomo had been mandating COVID patients into nursing homes, I took it as a personal insult—as if he said to my face: *"You wasted ten years of your life. Your parents were nothing but disposable elderly trash."*

As the body count in nursing homes kept rising—and Governor Cuomo kept insisting *"they don't have the right to object"*—by the time July rolled around I suspected the NY Attorney General's Office might have been intentionally overlooking his negligence for partisan reasons. Since New York is a highly regulated state, I figured if Governor Cuomo did anything wrong, it would stand out like blood on freshly fallen snow in his Executive Orders.

Then, around mid-July of 2020, my mind kept drifting back to a moment in St. John's Law School when <u>Professor Vincent Alexander</u> said: *"Never rely on a summary of a statute. If your case involves a statute, then sit your butt down and READ it until you understand it completely. I call it Butt Power."*

Since I'd always considered Professor Alexander to be the quintessence of legal professionalism with the moral sense of Atticus Finch, I *'sat my butt down'* and read through Governor Cuomo's COVID Executive Orders. Once I read **Executive Order 202.5**, I realized the NY Attorney General's Office never lifted a finger to investigate anything; since ***<u>any 2nd year law school intern</u>*** assigned to analyze Governor Cuomo's COVID Executive Orders for evidence of wrongdoing ***<u>would have found it in less than an hour.</u>***

However, since the evidence was buried in thick bureaucratese, I spent the next four years not only simplifying how **Executive Order 202.5** *<u>read in tandem with</u>* the **March 25th Nursing Home Directive** slaughtered more than 15,000 nursing home residents but analyzing the underlying motive for them. After all, you don't **suspend admission regulations that protect nursing home residents from exposure to communicable disease during a** *"pandemic emergency,"* only to mandate COVID patients into nursing homes a week later, unless you intend to kill them.

*<u>"No. That's not true. That's impossible,"</u>* I hear you say. Well, logic doesn't care about your feelings. In fact, allow me to disabuse you of the notion to *"trust your feelings"* in this case by showing you the glaringly obvious **<u>proof</u> of murder** that took me *<u>five months</u>* to notice after reading **Executive Order 202.5**.

# I. *"LOCKING DOWN"* AN ENTIRE STATE TO *"PROTECT THE VULNERABLE ELDERLY POPULATION"* FROM COVID *WHILE SIMULTANEOUSLY* MANDATING COVID PATIENTS *INTO* NURSING HOMES WITHOUT COMMITTING DEPRAVED INDIFFERENCE MURDER IS *LOGICALLY IMPOSSIBLE.*

If you think that sounds like *"misinformation," "disinformation,"* or *"conspiracy theory, "* you're not thinking logically.

To wit:

A person is guilty of Depraved Indifference Murder when, under circumstances evincing a depraved indifference to human life, he recklessly engages in *conduct which creates a grave and unjustifiable risk of death* to another person, knowingly disregards such risk, and thereby *causes the death of that person.*

"Depraved indifference to human life" means a wicked, evil, or inhuman state of mind, as manifested by brutal, heinous, and despicable acts. We're talking about conduct that is so devoid of regard for the life or lives of others that it's just as malicious and criminal as the person who intentionally kills.

The phrase "recklessly engages in *conduct which creates a grave and unjustifiable risk of death* to another person" means:

- Engaging in conduct which creates a grave and unjustifiable risk that another person's death will occur,
- AND consciously disregarding that risk in a way that constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

No reasonable person would ever take two completely contradictory courses of action within a life *or* death situation while claiming both were *simultaneously* intended to save lives. The truth of one necessitates the falsity of the other. More particularly: *The safety of one course* of action *necessitates the lethality of the other.*

4

Thus, no reasonable person or State would <u>lockdown the entire healthy population</u> for the alleged purpose of keeping the COVID virus as far from the vulnerable elderly as possible *while simultaneously* <u>creating a grave and unjustifiable risk of their deaths</u> by mandating COVID patients into nursing homes.

If one truly believed *"the necessary precautions"*—i.e., <u>the CMS and CDC "transmission based precautions"</u>—would keep the elderly safe enough to justify the nursing home mandate, then the <u>lockdown</u> was <u>never necessary</u> and <u>all deaths resulting therefrom</u> were Depraved Indifference Murder.

Likewise, if one truly believed the "novel" virus was so lethal and difficult to contain as to warrant <u>locking down the entire healthy population</u> for the ostensible purpose of protecting the elderly from COVID, then mandating COVID patients into nursing homes during <u>the lockdown</u> was Depraved Indifference Murder.

Thus, because mandating COVID patients into nursing homes during the lockdown <u>violates the law of noncontradiction</u>, it is **DEDUCTIVE—*sans counterfactual premises*— PROOF** of Depraved Indifference Murder. Incredible as it may sound, <u>there is no triable issue of fact because any conceivable defense is a logical impossibility</u>—making *both* the lockdown and the nursing home mandate acts of malice necessarily. Thus, <u>every death</u> resulting from the nursing home mandate *and* the statewide lockdown—while both were simultaneously in effect—was Depraved Indifference Murder.

Accordingly, since **DEDUCTIVE <u>PROOF</u> of Depraved Indifference <u>Murder</u>** constitutes a highly anomalous <u>characteristic of pandemic disease</u> by even the most charitable of interpretations, it necessitated a <u>Kantian *Critique*</u> of the stories we were told about COVID-19 in light of Executive Order 202.5 & the March 25th Nursing Home Directive.

5

## II. THE STATE OF NEW YORK, THROUGH FORMER GOVERNOR ANDREW M. CUOMO, COMMITTED MASS DEMOCIDE BY MANDATING COVID PATIENTS INTO NURSING HOMES *AFTER HE SUSPENDED THE ADMISSION REGULATIONS THAT PROTECT RESIDENTS FROM EXPOSURE TO COMMUNICABLE DISEASE SEVEN DAYS EARLIER* WITHIN EXECUTIVE ORDER 202.5.

On March 25, 2020, New York State's Department of Health prohibited nursing homes from denying admission or re-admission of residents based solely on a confirmed or suspected diagnosis of COVID-19.   It even prohibited them from testing hospital transferees prior to admission as well.

> No resident shall be denied re-admission or admission to the [Nursing Home] solely based on a confirmed or suspected diagnosis of COVID-19. [Nursing Homes] are prohibited from requiring a hospitalized resident who is determined medically stable to be tested for COVID-19 prior to admission or readmission.[1]

Aside from an article in the Wall Street Journal,[2] the March 25th nursing home mandate went unnoticed for 25 days, until April 20th, 2020, when Governor Cuomo feigned ignorance of it in response to a reporter's question.   *Pay close attention* to how Governor Cuomo clarifies the reporter's vaguely worded curiosity about "state policy" into *a pointed question about the specific policy he claims to be ignorant of.*

> **Speaker 4:** (36:49) Given the high number of deaths in nursing homes… what is the state's policy regarding admission or readmission to these nursing homes? Whether or not one of these people have tested for the virus. There was a state directive that said that people cannot be denied readmission or admission. Just wondering what the state policy is right now, again, judging the high number of deaths that are coming out of these areas.
>
> **Governor Andrew Cuomo:** If you are tested positive for the virus, *are you allowed to be admitted to a nursing home* is the question. It's a good question. *I don't know. (Emphasis added)*

---

[1] *New York health website deletes Cuomo's order linked to nursing home fatalities*, By Gregg Re, Fox News, May 26, 2020

[2] The March 25th nursing home mandate was first reported in The Wall Street Journal article *New York Mandates Nursing Homes Take Covid-19 Patients Discharged From Hospitals, by Anna Wilde Mathews*, on March 26, 2020; see also The Mark Levin show, at 1:46:45 -- Elaine from New Rochelle tells Levin about the March 25th mandate.

6

**NYS Health Commissioner, Dr. Howard Zucker:** (37:36) **The policy is that if you are positive** (*clears throat*), **you should be admitted back to a nursing home,** (*clears throat*). **The necessary precautions will be taken to protect the other residents there.**

Six months later, on October 14, 2020, during an interview promoting his book: *American Crisis: Leadership Lessons from the COVID-19 Pandemic,* Governor Cuomo gaslighted CNN's Alisyn Camerota by pretending the nursing home mandate never existed.

> **Governor Cuomo:** *We never* in this state *told the nursing home you have to accept a COVID positive person.* Never happened.
>
> **Alisyn Camerota:** But where else could they have gone if they were being taken out of hospitals because hospitals were overrun then where else could they have gone?
>
> **Governor Cuomo:** Good question. *Hospitals were never overwhelmed.* We always had excess capacity in hospitals. We always had excess capacity in emergency hospitals that we built. So we were never in a situation where we had to have a nursing home accept a COVID positive person. [3]

Got that? The nursing homes were never told "*you have to accept a COVID positive person*" because *"hospitals were never overwhelmed."*

Contradictions are fatal to frauds. Thus, the reason a deceiver deals in generalities—i.e., uses ambiguous terms. And thus, when an arrogant fraud like Andrew Cuomo commits himself to a firm statement, he runs the risk of contradicting himself later. And four months later—while explaining away the thousands of nursing home deaths his administration hid—he did just that:

> **Andrew Cuomo:** (54:19) I'm glad New Yorkers had the opportunity to hear from Dr. Zucker. Of course, his credentials are impeccable, but when you hear the facts from him, you hear the reasoning from him, you understand why these decisions were made and you understand the decisions were right. *The hospitals were being overwhelmed.* People needed acute care in those hospitals. [4]

---

[3] Governor Andrew Cuomo interviewed by Alisyn Camerota, CNN, October 14, 2020
[4] Governor Cuomo Announces Nursing Home Visitations to Resume, February 19, 2021

7

Isn't that amazing?  The *"hospitals were never overwhelmed"* and yet, *"the hospitals were being overwhelmed."*  What a superposition to take.

As psychopathic as that contradiction may be, it pales in comparison to the way Cuomo revealed himself to be a cold-blooded killer answering Camerota here:

> **Alisyn Camerota:** There was never an instruction given to hospitals that nursing home patients had to leave and go back to nursing homes?  And you're saying there was never an instruction to nursing homes that they had to take them?
>
> **Governor Cuomo:** There was never a point in time where we … said to a nursing home you must take a Covid positive person. *The law is exactly the opposite* Alisyn.  The law in this state says a nursing home may not accept a person unless they can care for that person and do it *without endangering the other people in the facility.*[5]

On February 19, 2021—while defending his medical decision to mandate COVID patients into nursing homes with his March 25th Directive—Dr. Howard Zucker resorted to the same bureaucratese as Governor Cuomo.

> **Dr. Howard Z.:** (48:41)  As always, if they could not accept a patient, they should not admit the patient. It is against the law to take someone that they cannot care for.  We simply said, "You cannot deny admission based on COVID status." *We never said, "You must accept."* We said, *"You can't deny it."*[6]

So, why would the doctor/attorney defend his medical decision with legal pedantry that would make Mephistopheles blush?  Moreover, why would the doctor parse the very same words as the governor?

[5] Governor Andrew Cuomo interviewed by Alisyn Camerota, CNN, October 14, 2020
[6] New York Gov. Andrew Cuomo COVID-19 Press Conference Transcript February 19, 2021

*"Occasionally words must serve to veil the facts. But this must happen in such a way that no one become aware of it; or, if it should be noticed, excuses must be at hand to be produced immediately."*—**Machiavelli**

# EXECUTIVE ORDER 202.5

On March 18, 2020, two days before the lockdown and one week before the March 25th nursing home mandate, Governor Cuomo signed **Executive Order 202.5.** In that Order, *he* *suspended* **three nursing home admission regulations that _normally_ protect residents from** **exposure to communicable disease**—as if the "Declared Emergency" was a blizzard or Super Storm Sandy. You'll see why that's important in a minute. For simplicity's sake, we'll call them Rules 1, 2, and 3.

**RULE 1**[7] *normally* says *'you can't admit a patient into a nursing home without a* *comprehensive assessment of the potential resident's current medical conditions and prior* *medical history.'* For example, the nursing home should know if they're getting a patient with Typhoid, Tuberculosis, or any other highly contagious disease so they can determine whether they're staffed and equipped to handle the patient without endangering the other residents.

**RULE 2**[8] *normally* says no individual can be admitted into a nursing home unless *"a* *physician personally approves"* the recommendation for admission. This *normally* ensures that nursing homes don't admit patients based on the word of an organ grinder's monkey; unless said monkey also happens to be a licensed physician with admitting privileges.

---

[7] "Section 400.12 of Title 10 of the NYCRR"
[8] "Subdivision b of section 415.15 of Title 10 of the NYCRR"

9

And **RULE 3**[9] *normally* says:

> A resident suffering from a communicable disease **shall not be admitted or retained unless a physician certifies in writing** that transmissibility is negligible, and poses no danger to other residents, or the facility is staffed and equipped to manage such cases without endangering the health of other residents.

*Normally,* this regulation acts as a form of vigilance insurance by placing the physician and his license to practice medicine directly between vulnerable nursing home residents and the threat of contracting an infectious disease from new admissions—*especially during a pandemic.*

Thus, Governor Cuomo and Dr. Howard Zucker could *normally* claim they never told the nursing homes *"You must accept"* a COVID positive patient because Rules 1, 2, and 3 would *normally* not *permit* it.

> **Governor Cuomo:** There was never a point in time where we … said to a nursing home you must take a Covid positive person. *The law is exactly the opposite* Alisyn. The law in this state says a nursing home may not accept a person unless they can care for that person and do it *without endangering the other people in the facility.*[10]

> **Dr. Howard Z.:** As always, if they could not accept a patient, they should not admit the patient. It is against the law to take someone that they cannot care for. We simply said, "You cannot deny admission based on COVID status." *We never said, "You must accept." We said, "You can't deny it."*[11]

To a *normal* human being, there's no difference between *"you must accept"* a patient and *"you can't deny"* admission. However, to word-fetishizing mass murderers the difference is the term *"permit"*—as in:

> *"If you are tested positive for the virus, are you allowed to be admitted to a nursing home is the question. It's a good question. I don't know."*

---

[9] "Subdivision i of section 415.26 of Title 10 of the NYCRR"
[10] Governor Andrew Cuomo interviewed by Alisyn Camerota, CNN, October 14, 2020
[11] New York Gov. Andrew Cuomo COVID-19 Press Conference Transcript February 19, 2021

Because one week before mandating COVID patients into nursing homes with the March 25th Directive, Governor Cuomo laid the foundation for making it a death warrant by modifying (read: suspending) Rules 1, 2 and 3 within E.O. 202.5 thusly:

> **RULE 1:**[12] *to Permit nursing homes to perform comprehensive assessments of patients as soon as practicable FOLLOWING ADMISSION* [or forget it entirely if] they're being returned from the hospital to the nursing home from which they were *evacuated*;[13]

**Translation with March 25th Directive:** *"You are Prohibited from testing a hospitalized resident for COVID prior to admission; And You Cannot Deny Admission based on COVID status Or for lack of a Comprehensive Assessment*—because you can assess the patient *FOLLOWING ADMISSION*.

Therefore: *Admit Now, without a Comprehensive Assessment.*

Imagine airport security saying: *"We were under a heightened terrorist threat. So, to get wheels up ASAP, we held off on screening the passengers and their luggage for bombs until they were 'safe' at 30,000 feet."* Same thing.

> **RULE 2:**[14] to *Permit* nursing homes to admit patients first, then get physician approval *FOLLOWING ADMISSION* [or forget it entirely if] they're being returned from the hospital to the nursing home from which they were *evacuated*.

**Translation with March 25th Directive:** *"You are Prohibited from testing a hospitalized resident for COVID prior to admission; And You Cannot Deny Admission based on COVID status Or for lack of A Physician's Approval because you can get that FOLLOWING ADMISSION.*

Therefore: *Admit Now, without A Physician's Approval.*

---

[12] "Section 400.12 of Title 10 of the NYCRR"
[13] Executive Order No. 202.5, March 18, 2020 (**Note** the use of the word "evacuated.")
[14] "Subdivision b of section 415.15 of Title 10 of the NYCRR"

11

**RULE 3:**[15] to *Permit* nursing homes to admit patients first, then comply with admission procedures as soon as practicable *FOLLOWING ADMISSION*[ [or forget such procedures entirely if] they're being returned from the hospital to the nursing home from which they were *evacuated*.

**Translation with March 25th Directive:** *"You are Prohibited from testing a hospitalized resident for COVID prior to admission; And You Cannot Deny Admission based on COVID status Or for lack of A Physician Certifying In Writing: "that transmissibility is negligible, and poses no danger to other residents, or [that] the facility is staffed and equipped to manage such cases without endangering the health of other residents" because you can get that FOLLOWING ADMISSION.*

Therefore: *Admit Now, without A Physician's Written Certification.*

## 1001 Ways Cuomo Perjured Himself Before the Select Subcommittee on the Coronavirus Pandemic

On September 10, 2024, former Governor Cuomo testified to the House COVID subcommittee:

> **GOV. CUOMO:** The committee attempts to argue that the [March 25th] advisory … **overrode safety laws,** but that has already been investigated by the New York Attorney General, who said they are wrong. Who confirmed the March 25th advisory [didn't kill] thousands in nursing homes. In fact, the report finds no causality whatsoever. Not one death. All hype. Why? Because it never happened.

New York Attorney General Letitia James found nothing because **she investigated nothing.** She even had the audacity to cite the very agency responsible for the March 25th Directive as authority for exonerating it: ***"DOH has said*** *that nothing in the guidance stated that a facility should accept patients who could not be safely cared for."*[16]

---

[15] "Subdivision i of section 415.26 of Title 10 of the NYCRR"
[16] *Nursing Home Response to COVID-19 Pandemic*, Jan. 30, 2021, pg. 37

12

However, the DOH issued the March 25th *"guidance"* **one week after** Cuomo signed **Executive Order 202.5**—which, as demonstrated above, made its words a death warrant. As evidenced by her report, the NY Attorney General knew this, making her complicit in the crime and just as motivated as Cuomo to cover it up.

Thus, the reason Governor Cuomo kept repeating to the COVID Subcommittee: *"**the Attorney General's position [is] ... the law of the State of New York.**"*

> **GOV. CUOMO:** The Attorney General of New York who governs the New York law and interprets the New York law found [in her report] ... quote, ... *"while some commentators suggested the [March 25th] guidance was a directive that nursing homes accept COVID-19 patients even if they could not care for them, **such an interpretation would violate statutes and regulations that place obligations on nursing homes to care for residents.**"* ... That's the Attorney General's position, and that's the law of the State of New York.

Conversely, *"the Attorney General's position [is not] the law of the State of New York,"* because *Allegans contraria non est audiendus*—a person making contradictory allegations is not to be heard.

Cuomo was citing footnote 45 of *Nursing Home Response to COVID-19 Pandemic,* which reads in pertinent part:

> **45** While some commentators have suggested DOH's March 25 guidance was a directive that nursing homes accept COVID-19 patients even if they could not care appropriately for them, **such an interpretation would violate statutes and regulations that place obligations on nursing homes to care for residents.** For example, New York law requires a nursing home to "accept and retain only those residents for whom it can provide adequate care." See **10 NYCRR § 415.26(i)(1)(ii)....**[17] **[RULE 3]**

The Attorney General then goes on to *contradict footnote 45 in its entirety* by admitting within **Appendix A** of that same report: *"**Executive Order 202.5** allowed transfer to [Nursing Homes] and suspended ... **10 NYCRR § 415.26(i)(1)(ii)**"* **[RULE 3]**.

---

[17] *Id.,* Pg. 72

For those of you keeping score at home, **footnote 45 + Appendix A** = *"[The] DOH's March 25 guidance [was not] a directive [because] <u>such an interpretation would violate</u> …* */RULE 3/;"* even though *"Executive Order 202.5 … <u>suspended</u> [RULE 3]."*

> **GOV. CUOMO:** This [March 25th *"guidance"*] … did not substitute for the existing state law. **And the state law remains in place.** And the state law says on the nursing home, **415.26, [RULE 3]** you cannot accept the person you can't care for.[18]

What a <u>superposition</u> to take.

Moreover, conspicuously absent from **Appendix A (pg. 59)** is any mention that **Executive Order 202.5 also suspended § 400.12 [RULE 1:]**—requiring a full **ASSESSMENT** before admission—which enabled Governor Cuomo to serve up this whopper to the COVID Subcommittee:

> **GOV. CUOMO:** … the nursing homes were not directed to accept anyone. **It was up to the discretion of the nursing home.** That was made abundantly clear. **All of the laws of the state of New York remained in effect.** As a matter of fact, the law of the state of New York says they can only accept people who they can care for. The law of the state of New York says they have to do a full [ASSESSMENT] before a person comes in. [RULE 1:] They have to have **a written letter saying the person is not infectious or an infection plan in place. [RULE 3]** So, every law in the state of New York governing **nursing homes was in effect, sir.**[19]
>
> …

---

[18] <u>Former Governor Andrew Cuomo Testifies on New York State's COVID-19 Response</u>, 9/10/2024
[19] <u>Former Governor Andrew Cuomo Testifies on New York State's COVID-19 Response</u>, 9/10/2024

14

*"To sum up all—To words hold fast!"*
Mephistopheles, *Faust*

## A *word* about *"being returned from the hospital to the nursing home from which they were evacuated."*

A lockdown is the opposite of an *evacuation*. No one was *evacuated* during the lockdown; not even to the empty Hospital Ship and Javits Center.[20]

The word *'evacuated'* is a vestige of Executive Orders typically issued during emergencies justifying those three modifications, e.g., extended power outages due to snowstorms and hurricanes.[21] In those situations, *'evacuating'* residents from one facility to another is **tantamount to moving them between rooms, since *they've already been screened for communicable disease.*** Thus, during a snowstorm or hurricane emergency, those three modifications remove a hindrance to the *'evacuation'* by taking the calculated risk that no one will contract a communicable disease during the transfer.

During a declared *"pandemic emergency,"* however, those three rule changes demonstrate **intent to kill the nursing home residents.**

All Cuomo had to do next was *Enforce The Rules*.

> **Governor Cuomo (April 23, 2020):** (14:54) Nursing homes, they are our top priority. They have been from day one. Remember how the nursing home system works. ... There are certain rules and regulations that they must follow, and *we put in additional rules and regulations on nursing homes* in the midst of this crisis. ... The nursing home is responsible for providing appropriate care. If they cannot provide that care, then they have to transfer the person to another facility.
>
> **They have to readmit** COVID-positive residents, *but only if they have the ability to provide the adequate level of care under Department of Health and CDC guidelines.* ... That is how the relationship works. [22]

---

[20] See *Hundreds of Hospital Beds Left Empty on the USNS Comfort and Javits Center During Cuomo's Nursing Home Order*, By Kristina Wong, Feb. 22, 2021

[21] See identical 'evacuate' language in E.O. 72, Nov. 11, 2012; E.O. 139, Nov. 20, 2014; E.O. 141, Jan. 6, 2015

[22] Andrew Cuomo New York COVID-19 Briefing Transcript April 23, 2020

15

No, that's the opposite of *'how the relationship worked,'* because the March 25th mandate read in tandem with Executive Order 202.5 made admission procedures a lethal carnival game the nursing homes couldn't possibly win.

- How do you assess whether you *"have the ability to provide the adequate level of care under Department of Health and CDC guidelines,"* when the State is mandating that: ***"You are Prohibited from testing a hospitalized resident for COVID prior to admission; And You Cannot Deny Admission based on COVID status OR for lack of a Comprehensive Assessment of The Patient?***

- How do you assess whether you *"have the ability to provide the adequate level of care under Department of Health and CDC guidelines,"* when the State is mandating that: ***"You are Prohibited from testing a hospitalized resident for COVID prior to admission; And You Cannot Deny Admission based on COVID status OR for lack of A Physician's Approval?***

- How do you assess whether you *"have the ability to provide the adequate level of care under Department of Health and CDC guidelines,"* when the State is mandating that: ***"You are Prohibited from testing a hospitalized resident for COVID prior to admission; And You Cannot Deny Admission based on COVID status OR for lack of A Physician Certifying In Writing: "that transmissibility is negligible, and poses no danger to other residents, or [that] the facility is staffed and equipped to manage such cases without endangering the health of other residents?"***

**Answer:** You can't; because those three admission rule modifications and the March 25th Directive were TREASONABLY designed to murder enough mothers needed to *shame us* into locking down, masking up, and socially distancing ourselves into isolation, loneliness, and financial ruin in order to *"build back better"* toward the relief promised by *"a new normal."*

As His Lordship put it on April 15th and 17th, 2020:

> **Governor Cuomo:** (04:19) …People are restless. We have to talk about the reopening of the economy. How do we do this? We have to build a bridge from where we are to the reopening of the economy. What does that look like? Let's say that where we're going, it's not a reopening in that we're going to open what was, we're going to a different place. We should go to a different place. We should go to a better place. *If we don't learn the lessons from this situation, then all of this will have been in vain.* We learned a lot if we're willing to open our eyes and open our ears.

16

We're going to a different place, which is *a new normal.* We talk about the *new normal,* we've been talking about the *new normal* for years. We're going to have *a new normal* in public health. By the way, the way we have *a new normal* on the environment, *a new normal* in economics, *a new normal* in civil rights, *a new normal* in social justice. This is the way of the world now.

**Gov. Andrew Cuomo:** (24:21)… *Our Goal* is not let's get up and turn the machine back on and keep going the way we were. No. How do you make the changes now that you've been talking about in some cases for years, by the way, but you never had the political will to do it? Or it was too hard, or it was too difficult.

We talk about environmental changes that we're going to make, but we never really do it. We talk about issues of income inequality, but we never really get there. We talk about changes to our public transit system, but it's too hard, it's too controversial. All right, well now you have an opportunity in this window to really make changes and reforms and improve things in a way you haven't. And by the way, if you went through this and *you went through this pain and aggravation and suffering and you didn't learn,* well, *then shame on us. Then shame on us.* Because there are so many lessons to learn and then you've come back better than you were…. You *build back better* than before. …[23]

Thus, when asked whether any of the nursing homes objected to the March 25th Directive, Governor Cuomo demonstrated his murderous intent and resolve to levy war against the United States thusly:

**Speaker 10:** (46:52) Did any nursing homes object to one, this policy, and two…

**Governor Cuomo:** (46:55) *They don't have the right to object.*[24] *That is the rule, and that is the regulation,* and they have to comply with it, and the regulation is basic common sense. If you can't provide adequate care, you can't have the patient in your facility, and that's your basic fiduciary obligation, I would say ethical obligation, and it's also your legal obligation. If you can't provide adequate care, the person must be transferred. If you have COVID people, they have to be quarantined, they have to have separate staff, *that's the rule.* If you can't do it, we'll put them in a facility that can do it. *That's the rule.*[25]

---

[23] New York Gov. Andrew Cuomo, Daily Covid briefing, April 17, 2020
[24] *Nursing homes have 'no right' to reject coronavirus patients, Cuomo says*, NY Post, April 23, 2020
[25] Andrew Cuomo New York COVID-19 Briefing Transcript April 23, 2020

17

No, that *was* the rule before Executive Order 202.5 stripped Nursing homes of their procedural leverage to keep infectious disease patients from being **forced through their doors.** Without E.O. 202.5, the nursing homes would never have interpreted the March 25th mandate as: *"You must accept"* COVID patients—to the tune of more than 9,000 transfers.[26]

---

[26] *Over 9,000 COVID-19 patients sent into NY nursing homes*, by AP, NY Post, Feb. 11, 2021